**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |
| JEANNE HOCHSTETLER, ) | |
|   ) | |
|   Plaintiff, ) | |
|   ) | Civil Action No. |
|   v. ) | 12-10735-NMG |
|   ) | |
| INTERNATIONAL BUSINESS MACHINES, ) | |
| INC., ) | |
|   ) | |
|   Defendant. ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |

<u>**MEMORANDUM & ORDER**</u>

**GORTON, J.**

This case arose after plaintiff Jeanne Hochstetler ("plaintiff") was laid off from her technical writing position with defendant International Business Machines, Inc. ("defendant" or "IBM").  Plaintiff's suit alleges that IBM failed to accommodate her Sjogren's Syndrome and that she was terminated in part because of her age and disability.

Pending before the Court are defendant's motions for summary judgment (Docket No. 16) and to strike portions of plaintiff's affidavit (Docket No. 30) and plaintiff's cross-motion for leave to file an amended affidavit (Docket No. 42). For the reasons that follow, all three motions will be allowed, in part, and denied, in part.

I.   **Background**

   A.   **Overview of plaintiff's employment history**

   Plaintiff is 63 years old.  She has a bachelor's degree and a master's degree in English from Indiana University and has been employed as a technical writer since 1982.  She claims that she was promoted to her first managerial position in 1992.

   In 2005, Plaintiff took a job as a documentation manager of the Rhapsody Software product at I-Logix, a software company in Andover, Massachusetts.  In 2006, Telelogic, another software company, acquired I-Logix and plaintiff became a Telelogic employee.  IBM, the defendant in this case, acquired Telelogic in 2008.  Plaintiff worked for IBM from 2008 until she was laid off in 2010.  She obtained a position at a different company, NetApp, two months after she was laid off.

   Plaintiff also earns $800 to $1,000 per year running a small quilt-making business out of her home.  She sells about two quilts per year and only quilts occasionally.

   B.   **Plaintiff's disability**

   Plaintiff was diagnosed with Sjogren's Syndrome in 2002. Sjogren's Syndrome is an autoimmune disease that causes the body's white blood cells to attack its moisture-producing glands.  Plaintiff claims that the condition causes her to suffer from chronic fatigue and swollen and painful joints.  Due to her joint problems, she claims that she had trouble bending

-2-

in certain ways, climbing stairs, typing, getting up from a
sitting position and driving.

Plaintiff has been prescribed two medications, Provigil and
Hydroxychloroquine, to counteract the effects of Sjogren's
Syndrome.  Hydroxychloroquine reduces the swelling in her joints
while Provigil is used to combat fatigue.  Plaintiff generally
takes Provigil daily at 8:00 A.M. but it wears off sometime
after 5:00 P.M.  She claims that, once the medication wears off,
she cannot drive safely or concentrate enough to write
documentation, and therefore needs to limit her work to 45 hours
per week.  She asserts that she cannot take a second dose of
Provigil mid-day in order to extend her work day because her
doctor has told her that it would be bad for her kidneys.

### C.   Relevant employment history and performance

#### 1.   Plaintiff's performance at I-Logix and Telelogic

Plaintiff worked as a documentation manager at I-Logix and
Telelogic between 2005 and 2008 and was supervised by Ray Blash
("Blash").  Blash found that plaintiff "usually exceeds
expectations" in her two performance reviews during that period.
He gave plaintiff top scores for her documentation work and
lower scores for her interpersonal skills.

Blash advised plaintiff as part of those reviews that she
needed to work on her communication with other employees because
her comments over email and in meetings struck others as

defensive, curt and dismissive.  And in early 2008, Blash ordered plaintiff to come up with a plan to improve her interpersonal relationships and communication with other employees based on feedback from the employees she managed. Those employees reported to Blash that plaintiff's difficult relationships with Telelogic employees outside her team were an obstacle to the team's success.

### 2.  Plaintiff's transition to IBM

Plaintiff began working at IBM's Littleton and Andover offices in July, 2008 after IBM acquired Telelogic.  At first, little about plaintiff's job changed.  She continued to report to Blash and manage a team of other writers.  However, plaintiff was informed in November, 2008 that, as a result of a reorganization of her group, she would be considered a "team lead" rather than a "manager" but her salary would not change.

In or around November, 2008, plaintiff spoke on the telephone with Susan LaFera ("LaFera"), IBM's program director for Rational User Technologies, about the process of integrating former Telelogic employees into IBM.  LaFera is based in South Carolina.  Plaintiff asserts that she mentioned that she was 58 years old during their conversation.  LaFera has no recollection of plaintiff revealing her age to her during that conversation or at any point thereafter.  She also states that she would have had no reason to inquire about plaintiff's age.

In January, 2009, plaintiff learned that she would be reporting to Janis Steinfeld ("Steinfeld"), who is based in Oregon and reports to LaFera.  Steinfeld supervised plaintiff's entire Rhapsody Software group of document writers who had worked together at Telelogic.  She avers that she was unaware of plaintiff's age during plaintiff's tenure at IBM.

### 3.   Plaintiff's conversations with Steinfeld and LaFera about goal-setting and her disability

In early 2009, plantiff worked with Steinfeld and LaFera to set goals for the upcoming year.  Her 12 goals included developing guidelines for a documentation project, initiating contact with customers, developing new partnerships between development teams, leading a product integration effort and acting as a formal and informal mentor to other IBM employees.

The parties disagree about whether it was appropriate for plaintiff, as a "Band 9" employee, to be required to set and complete 12 goals rather than some lesser number.  While neither party explains the nature of the "Band" system in their filings, it appears that employees who are given more responsibility and expected to serve in leadership or strategic roles are assigned higher band numbers.

Plaintiff asserts that she was initially instructed by Steinfeld to set five or six goals.  According to plaintiff, Steinfeld told her that the six goals she came up with were not

"Band 9-level goals" and required her to revise her goals and add four more.  LaFera instructed plaintiff to add two more goals during an April, 2009 conference call.

Plaintiff avers that she informed LaFera and Steinfeld during that conference call that she could not accomplish her 12 goals during a standard work week due to her Sjogren's Syndrome. LaFera told her that she would have to work 60 or 70 hours per week if necessary to complete her goals for the year.  Plaintiff responded that it would not be possible for her to work that number of hours because she could not stay in the office later than 5:00 P.M. due to her disability.  Steinfeld told her that IBM's human resources department would have to authorize reducing her hours.

In May, 2009 plaintiff submitted a form completed by her doctor that asked that plaintiff be permitted to work no more than 45 hours per week.  IBM approved that request for the six-month period between May 1, 2009 and October 31, 2009.  In early October, 2009, plaintiff submitted a second doctor's note to the same effect.  IBM granted that accommodation as well.  The doctor's notes only requested a limitation on work hours but did not expressly request a decreased workload.

Plaintiff claims that she told Steinfeld on more than one occasion that she couldn't complete the 12 goals within a standard 45-hour work week and asked if they could be reduced.

She avers that Steinfeld instead added new tasks, including tasks that were time-consuming but required less skill.

Steinfeld does not mention such conversations in her affidavit.  Instead, she states that 1) plaintiff typically worked no more than 45 hours per week before receiving the accommodation, 2) plaintiff never told her that she was working more than 45 hours per week after receiving the accommodation and 3) no one at IBM mentioned to her that plaintiff had complained that she was "unable to perform the essential functions of her job within a 45 hour workweek."  Steinfeld and LaFera both aver that they believed that plaintiff could complete her goals while working no more than 45 hours per week.

### 4.   2009 performance reviews

In June or July of 2009, Steinfeld conducted plaintiff's mid-year review and informed plaintiff that she had received a "3" rating which meant that she ranked in the bottom one-third of employees.  Steinfeld explained that, while plaintiff had successfully completed or initiated work on several projects, her interpersonal skills continued to be a problem.  She noted that plaintiff was reluctant to accept what was expected of her as a Band 9 employee.

Steinfeld conducted a more formal review of plaintiff's performance in January, 2010.  As part of the review process, plaintiff reported her progress toward her goals.  She stated

-7-

that she had accomplished all 12 of her goals and described, in some detail, the tasks she had completed.  Nevertheless, Steinfeld again rated plaintiff a "3".

Steinfeld noted that plaintiff had overseen and completed much of the work required for two documentation releases and ensured that her team met all of its milestones.  Her report also indicates that plaintiff did a "good job" in the latter half of 2009 with initiating collaboration across teams.  Yet she also noted several instances in which plaintiff had failed to meet expectations.  Consistent with her mid-year review and Blash's earlier reviews, Steinfeld found that plaintiff continued to have difficult relationships with others at IBM.

Unlike Blash, however, Steinfeld also had concerns about plaintiff's work product.  She explained that plaintiff's interpersonal difficulties hindered her ability to lead her team and collaborate with other teams and noted that her failure to collaborate resulted in problems with her team's projects. Steinfeld also found that some of plaintiff's own documentation work lacked depth and attention to detail.

### 5.   The 2010 workforce reduction

In February, 2010, plaintiff was one of 70 employees in IBM's Software Group selected for layoff.

IBM selected employees to let go as part of a "resource action" by first dividing employees into "job groups" based on

their "bands", job responsibilities and skill levels.  The
employees within each group were then rated "low", "medium" or
"high" in relevant skill areas.  Members of the management team
also evaluated employees' three most recent performance reviews,
if available, for evidence of an upward or downward trend in
performance over that period.  Ultimately, the employee or
employees with the lowest skill and performance ratings in the
group were laid off.

As part of that process, plaintiff was assigned to a job
group of Band 8 and 9 "Rational Assistance User Developers" who
were responsible for creating user assistance materials and who
led "cross-functional" teams in order to improve customer
satisfaction.  LaFera developed the criteria for membership in
the group and approved the group of employees that Steinfeld
selected.  The group consisted of six individuals, five of whom
led teams within the Rational Software group and one of whom
effectively did so.  At 60 years old, plaintiff was the oldest
member of the group.  The youngest member was 53 years old.
Steinfeld and LaFera aver that they did not have information
about individuals' ages nor was age relevant to their decision.

LaFera also selected five skills (deliverables, planning,
technical, customer focus and leadership) as appropriate
criteria for the group.  Plaintiff received the lowest skill-
level ranking in her job group based on those skills.

-9-

Specifically, she received "low" scores for deliverables, planning and leadership, "medium" scores for technical skill and customer focus and a "low" rating overall.  She was the only member of the job group to receive any "low" scores.  The next lowest ranked employee in the group after plaintiff received one "high" score and four "medium" scores and an overall "medium" rating.

Plaintiff also received the worst performance rating in her group.  She received a "2" rating in the only performance review listed on the job group report.  IBM did not consider plaintiff's performance reviews from I-Logix or Telelogic as part of its evaluation.  Three of the other employees under consideration also received "2" ratings during previous performance reviews while two received 2+ and 1 ratings.  However, the report indicates that all of the other employees were either increasing or sustaining their level of performance while plaintiff's performance had gone down.  Steinfeld and the other managers considered the 2009 annual review, in which plaintiff received a "3" rating", when determining the employees' job performance trends.

The three other members of plaintiff's documentation team were placed in different job groups than plaintiff and were not laid off.  Plaintiff worked with all three at Telelogic and

believes that they were all in their 40's or early 50's based on comments they made to her while they worked together.

More than 1,000 employees were evaluated as a result of that process and 70, including plaintiff, were laid off.  The employees who were laid off included seven workers between the ages of 20 and 29, sixteen between the ages of 30 and 39, twenty-two between the ages of 40 and 49, twenty-one between the ages of 50 and 59, and four between the ages of 60 and 69. Forty-three employees who were 60 or older at the time kept their jobs.

### 6.    Plaintiff's job at NetApp

In April, 2010, one month after she was laid off, plaintiff interviewed for a technical writer position with NetApp, a company based in Waltham, Massachusetts.  She started work at NetApp in June, 2010, at a salary similar to what she made in her final year at IBM.  She works from 9:00 A.M. to 5:00 P.M. and does not work weekends.  She has not submitted a doctor's note to NetApp seeking to limit her hours nor has she requested any accommodation for her disability.

### D.   Procedural History

Plaintiff filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (MCAD) in December, 2010.  The following year, she withdrew her claim before MCAD in order to bring the instant lawsuit, which she

filed with the Trial Court of Massachusetts Superior Court
Department for Middlesex County.  Her complaint alleges that IBM
laid her off because of her age and disability and also failed
to accommodate her disability, all in violation of Massachusetts
General Laws, Chapter 151B, § 4.

Defendant removed the case to this Court in April, 2012.  A
trial is scheduled to begin in January, 2014.  Defendant has
filed motions for summary judgment (Docket No. 16) and to strike
portions of plaintiff's affidavit filed as part of her
opposition to defendant's motion (Docket No. 30) and plaintiff
has filed a cross-motion for leave to file an amended affidavit
(Docket No. 42).

## II.  Defendant's Motion to Strike and Plaintiff's Cross-Motion to File an Amended Affidavit

As a preliminary matter, defendant has moved to strike
multiple excerpts from the affidavit submitted by plaintiff in
opposition to defendant's motion for summary judgment.
According to defendant, the challenged statements are
inadmissible hearsay, are not based on personal knowledge or
consist of arguments, conclusions or personal opinions.

Plaintiff objects to those characterizations with respect
to some of the challenged excerpts but has agreed to strike
certain other excerpts.  With respect to some of the latter
statements, she has moved to file an amended affidavit that she

believes addresses the infirmities of the original affidavit.
Defendant opposes her motion on fairness grounds and because
some of the proposed amendments suffer from the same problems as
the original statements.

After reviewing the parties' submissions, the Court has
determined that both motions should be allowed, in part, and
denied, in part.  It will consider defendant's objections to
plaintiff's specific amendments seriatim.

**A.   Sjogren's Syndrome (paragraph 7)**

The Court will strike, in part, plaintiff's statement about
the nature of her Sjogren's Syndrome.  Plaintiff, who does not
claim any medical expertise, has personal knowledge of the
symptoms that she experiences (e.g., joint pain and fatigue) but
not the cause of those symptoms (e.g., whether they are caused
by Sjogren's Syndrome attacking moisture in her body).
Similarly, the Court will strike plaintiff's statement about
what would happen if plaintiff's condition went untreated.

The Court will not, however, strike plaintiff's statement
about why she cannot take two doses of Provigil, because it is
relevant to why plaintiff believes that she needs to leave work
at 5:00 P.M. and is not being proffered to prove the truth of
the matter asserted.

The Court will allow plaintiff's proposed amendment to
paragraph 7 that explains how Sjogren's Syndrome affected her

before she began to take medication.  Defendant has not
specifically objected to that amendment.

### B.   Members of plaintiff's team (paragraph 8)

As explained below, evidence about other members of
plaintiff's team is irrelevant to any of plaintiff's claims in
this case.  As such, the Court will not consider the challenged
statements in paragraph 8 of plaintiff's affidavit.

### C.   IBM's methods of classifying employees and conducting performance reviews (paragraphs 11, 12 and 22)

The Court will strike the entirety of paragraph 11 in
plaintiff's affidavit and not allow her to amend that statement.
There is no foundation for her statement and the information she
seeks to add is irrelevant.  Similarly, paragraph 22 will be
stricken as immaterial.

The Court will not consider paragraph 12 when assessing
plaintiff's claims because the fact that plaintiff was
classified as a "senior software engineer" in IBM's internal
layoff document has no bearing upon any of her claims.

### D.   LaFera's age and motivations (paragraph 14)

The Court will strike plaintiff's statement that LaFera was
in her late 40's at the time and will not permit her to amend
her affidavit in that regard.  Plaintiff presents no evidence
that she knew of LaFera's age or that she ever personally met

LaFera.  The Court will not consider plaintiff's belief that LaFera was busy over the holidays.

### E.    The goal-setting process (paragraphs 18 and 19)

The Court will not strike plaintiff's statement that LaFera imposed upon her ambiguous goals that were more than plaintiff could accomplish in a year.  The plaintiff is entitled to state her opinion in that regard.  The fact that plaintiff asserted, as part of her performance review in 2009, that she accomplished all of the assigned goals is relevant to the weight, if any, that the fact-finder should give to that statement but it does not render it inadmissible.

The Court will not, however, consider plaintiff's statement that her team members were assigned fewer goals because any comparison to them is irrelevant.  Nor, for lack of foundation, will the Court allow plaintiff to amend her affidavit to include Steinfeld's statement that five or six goals were standard.

### F.    Steinfeld's statements to plaintiff's team about plaintiff's lay-off (paragraph 25)

The Court will strike paragraph 25 in its entirety because the first sentence is speculative and the second is inadmissible hearsay.  It will not permit plaintiff to amend because the proposed amendment does not correct the problem and includes irrelevant information.

### III. **Defendant's Motion for Summary Judgment**

### A. **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co._, 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc._, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." Id.  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  The non-moving party may not, however, rest merely upon

"conclusory allegations, improbable inferences and unsupported speculation." <u>Feliciano de la Cruz</u> v. <u>El Conquistador Resort & Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000).  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

   **B.  Application**

   Plaintiff alleges that defendant failed to make reasonable accommodation for her disability and that she was laid off because of that disability and her age.  The Court will consider each of those claims in turn.

   **1.  Reasonable accommodation claim**

   Plaintiff claims that IBM failed to accommodate her disability in violation of Massachusetts law.  In order to prove her case, plaintiff must demonstrate that 1) she has a physical or mental impairment that substantially limits one or more major life activities, 2) she was a qualified individual capable of performing the essential functions of her position with or without a reasonable accommodation and 3) IBM knew of her disability yet failed to accommodate it. <u>See</u> <u>Estades Negroni</u> v. <u>Assocs. Corp. of N. Am.</u>, 377 F.3d 58, 63 (1st Cir. 2004); <u>Russell</u> v. <u>Cooley Dickinson Hosp., Inc.</u>, 772 N.E.2d 1054, 1063 (Mass. 2002).

Defendant does not suggest that plaintiff was unable to perform the essential functions of her job with or without a reasonable accommodation and, indeed, never defines the essential functions of plaintiff's job.  The Court will therefore assume that plaintiff satisfies the second prong and will focus on whether plaintiff has proffered sufficient evidence with respect to the first and third prongs to avoid summary judgment.

### a.  Impairment

Defendant contends that it is entitled to summary judgment because plaintiff cannot show that she has an impairment that substantially limits one or more major life activities.

To show the requisite impairment, plaintiff must do more than submit evidence of a medical diagnosis. <u>City of New Bedford</u> v. <u>Mass. Comm'n Against Discrim.</u>, 799 N.E.2d 578, 589 (Mass. 2003).  She must proffer evidence that the impairment limits her participation in one or more major life activities and further that the limitation is substantial when compared with the unimpaired population.  "Major life activities" include, but are not limited to, walking, seeing, hearing, speaking, breathing, learning and working. M.G.L. c. 151B § 1.  Massachusetts law does not require courts to consider whether corrective devices or medication can be used to mitigate the effects of the

impairment.  See Dahill v. Police Dep't, 748 N.E.2d 956, 961
(Mass. 2001).

This issue is difficult to resolve because the only
relevant evidence is plaintiff's description of her symptoms in
her amended affidavit and a note from her doctor diagnosing her
with Sjogren's Syndrome and prescribing several medications to
treat undisclosed symptoms.  Nevertheless, the Court finds that
the submission of such evidence suffices to avoid summary
judgment on the first prong.  Plaintiff's affidavit suggests
that, without medication, she would suffer from joint problems
that affect her use of her hands and limit her mobility in
general.  Moreover, she cannot work more than 40 to 45 hours per
week due to the medication that she takes to control her
symptoms. See O'Brien v. Mass. Inst. of Tech., 976 N.E.2d 154,
158 n.7 (Mass. App. Ct. 2012) (suggesting without deciding that
inability to work overtime could suffice as an impairment under
M.G.L. 151B).  Defendant is free to challenge the severity of
her symptoms at trial but plaintiff has met her burden at the
summary judgment stage.

### b.   Feasibility of reasonable accommodation

To survive summary judgment, plaintiff must also establish
that defendant knew of her disability and yet failed to provide
her with a reasonable accommodation. Russell, 772 N.E.2d at
1063.  To that end, plaintiff bears the burden of showing that

1) she made an adequate request for an accommodation and 2) a reasonable accommodation of her disability was possible. See Garcia-Ayala v. Lederle Parentaerals, Inc., 212 F.3d 638, 648-49 (1st Cir. 2000); Ocean Spray Cranberries v. Mass. Comm'n Against Discrim., 808 N.E.2d 257, 271-72 (Mass. 2004).

In this case, there is sufficient evidence that plaintiff requested a reduction in workload.  The Court credits plaintiff's statements that she requested that her goals be reduced several times after IBM agreed to her limited schedule of 45 hours per week.

The fact that plaintiff's goals were not adjusted does not, however, resolve the issue in her favor. See Leach v. Comm'r of Mass. Rehab. Comm'n, 827 N.E.2d 745, 750-51 (Mass. App. Ct. 2005) (explaining that no reasonable fact-finder could determine that public agency failed in its legal duty to provide reasonable accommodations when it granted many of plaintiff's requests but denied other requests that may not have been feasible or necessary).  Instead, plaintiff must show that the additional accommodation would enable her to perform the essential functions of her job and that it was feasible for IBM under the circumstances. Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001).  If plaintiff carries that burden, then defendant may put on evidence that the proposed accommodation is not as feasible as plaintiff claims it to be.

-20-

Id.  Defendant also bears the burden of establishing that a given job function is "essential". <u>Gauthier</u> v. <u>Sunhealth Speciality Servs., Inc.</u>, 555 F. Supp. 2d 227, 240 (D. Mass. 2008) (citing <u>Ward</u> v. <u>Mass. Health Research Inst.</u>, 209 F.3d 29, 34 (1st Cir. 2000)).

The Court assumes that a fact-finder could determine that agreeing to reduce plaintiff's hours but refusing to decrease her workload constituted a failure to make a reasonable accommodation. <u>See</u> <u>Stutz</u> v. <u>Wis. Dep't of Corr.</u>, 642 F. Supp. 2d 881, 884 (W.D. Wis. 2009) (declining to grant summary judgment to employer when it reduced plaintiff's hours to 30 per week but refused to decrease her case load); <u>Smith</u> v. <u>Bell Atl.</u>, 829 N.E.2d 228, 241-42 (Mass. App. Ct. 2005) (declining to grant summary judgment when employer nominally agreed to an arrangement that would allow an employee to work from home but failed to implement the plan adequately).

It is unclear, however, whether plaintiff was assigned more work than she could handle given her limited hours.  Steinfeld avers that she believed that plaintiff could complete her assigned goals while working 45 hours per week and the Court cannot discern from the record whether plaintiff's workload was, in fact, more than she could reasonably be expected to complete within that time.  Plaintiff has proffered no evidence of how much time each additional "goal" added to her schedule nor has

-21-

she explained how her workload at IBM differed from her workload at I-Logix and Telelogic.  Finally, the fact that plaintiff reported completing all of her 12 goals as part of her 2009 performance review undermines her claim that she could not reasonably complete 12 goals while working 45-hour weeks.

The Court nevertheless finds that plaintiff's claim of failure to accommodate survives summary judgment.  Defendant has not demonstrated that all of plaintiff's goals were "essential functions" such that it would not have been reasonable for her workload to be reduced. See Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 107 (1st Cir. 2005) (explaining that the employer had failed to put forward any evidence that giving a disabled sales employee a type of account assigned to other employees would change an essential function of the employee's job). Furthermore, plaintiff claims that she was assigned time-consuming tasks requiring less skill after she received the accommodation that limited her work to 45 hours per week and asked Steinfeld for a reduction in her workload.  A jury could also infer from the differences between the evaluations of plaintiff's actual documentation work by Blash and Steinfeld that plaintiff was assigned more work than she could reasonably handle in a 45-hour week even though she reported having completed her goals for that year.

### 2.   Discrimination claims

Plaintiff also contends that she was laid off for unlawful reasons related to her age and disability.

To establish a prima facie case for age and disability discrimination during a workforce reduction, the plaintiff must show that 1) she was a member of a protected class (i.e. she was over 40 years old at the time her claim arose and she is a qualified handicapped individual within the meaning of the statute), 2) she was performing the duties of her job at an acceptable level, 3) she was laid off and 4) the layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination. See Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 533-34 (Mass. 2005); Knight v. Avon Prods., Inc., 780 N.E.2d 1255, 1261-62 (Mass. 2003).

If the plaintiff is able to make out a prima facie case, the burden shifts to the defendant to articulate a lawful, non-discriminatory reason or reasons for including plaintiff in the group of employees who were laid off. Sullivan, 825 N.E.2d at 537-38.  Once the defendant proffers such evidence, the burden shifts back to the plaintiff to adduce evidence that the defendant's reasons are pretextual. Id. at 540.

### a.   Age discrimination

Plaintiff has failed to make out a prima facie case of age discrimination.  The fact that she may have told LaFera her age

-23-

more than one year prior to her layoff is irrelevant.  There is no evidence to support the inference that LaFera was biased against plaintiff as a result of learning that information.  The fact that younger members of plaintiff's team were not laid off is also irrelevant because they were not part of her "job group" for purposes of the layoff. Compare id. at 537 (concluding that plaintiff established a prima facie case when her law firm employer retained lower-rated, younger attorneys in the same office with the same job classification as the plaintiff).

Finally, nothing about the outcome of the layoffs suggests that defendant's facially neutral procedures masked a discriminatory animus.  Employees of all ages were laid off. Out of the 47 employees aged 60 and older who were considered, 43 were retained and only four were discharged.

### b.   Disability discrimination

Even assuming that plaintiff could make out a prima facie case of disability discrimination, she cannot show that IBM's reasons for laying her off were pretextual.  IBM posits that it selected plaintiff based on her poor performance and skill level relative to employees in her software group who had similar job responsibilities.  Those ratings are supported by ample evidence in the record of plaintiff's difficulty in getting along with her colleagues as early as 2005. See Tobin, 433 F.3d at 105-06 (finding that terminated employee with a long and documented

-24-

history of poor performance could not show that his employer's reasons for firing him were pretextual).

Plaintiff has not claimed that her disability contributed to her inter-personal difficulties and thus has failed to show that there is a direct causal link between her disability and most of her poor performance ratings.  In fact, there is evidence that her difficulty with inter-personal relationships harmed her team's work product at IBM.  For instance, Steinfeld noted in plaintiff's 2009 review that plaintiff's failure to collaborate with people outside of her teams led to significant gaps in their documentation work.  Plaintiff's low ratings for "planning" and "leadership" are consistent with that record.

Finally, even if the Court assumes that plaintiff would have received a "high" rather than "low" score in "deliverables" had her workload been reduced to accommodate for her disability, she still would have been ranked lower by IBM's metric than the next lowest-ranked employee.  Thus, there is no evidence in the record that plaintiff was dismissed "because of" her disability.

## ORDER

In accordance with the foregoing,

1) Defendant's motion for summary judgment (Docket No. 16) is, with respect to plaintiff's age and disability discrimination claims, **ALLOWED**, but is, with respect to plaintiff's failure to accommodate claim, **DENIED**;

2) Defendant's motion to strike portions of the affidavit of Jeanne Hochstetler (Docket No. 30) is **ALLOWED**, in part, **DENIED**, in part, and **DENIED as moot**, in part, (as set forth below) and

3) Plaintiff's cross-motion for leave to file an amended affidavit (Docket No. 42) is **ALLOWED**, in part, and **DENIED**, in part (as set forth below):

- the phrase "that attacks moisture in my body" and the sixth sentence of paragraph 7 are stricken but plaintiff may amend the sixth sentence of paragraph 7;

- the Court will not consider paragraph 8 and plaintiff's motion for leave to amend is denied;

- paragraph 11 is stricken in its entirety;

- the Court will not consider paragraph 12;

- the Court will not consider the fourth sentence of paragraph 14 and the fifth sentence is stricken;

- the third sentence of paragraph 18 is not stricken;

- the third sentence of paragraph 19 is stricken and plaintiff's motion for leave to amend is denied;

- paragraph 22 is stricken in its entirety; and

- paragraph 25 is stricken in its entirety and plaintiff's motion for leave to amend is denied.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated December 31, 2013